Fernando Gaytan (SBN 224712) fgaytan@lafla.org
Paul J. Estuar (SBN 167764) pestuar@lafla.org
Shayla R. Myers (SBN 264054) smyers@lafla.org
**LEGAL AID FOUNDATION OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel:    (213) 640-3831
Fax:   (213) 640-3988


Paul L. Hoffman (SBN 71244)
Catherine Sweetser (SBN 271142) catherine.sdshhh@gmail.com
**SCHONBRUN DeSIMONE SEPLOW HARRIS & HOFFMAN, LLP**
723 Ocean Front Walk, Suite 100
Venice, CA 90291
Tel:  (310) 396-0731
Fax: (310) 399-7040

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES CATHOLIC WORKER, an unincorporated association; CANGRESS, a non-profit corporation; HARRY JAMES JONES, LOUIS GRADY, LLOYD HINKLE, WALTER SHOAF, individuals<br><br>Plaintiffs,<br><br>vs.<br><br>LOS ANGELES DOWNTOWN INDUSTRIAL DISTRICT BUSINESS IMPROVEMENT DISTRICT, CENTRAL CITY EAST ASSOCIATION, INC., CITY OF LOS ANGELES; DOES 1 -10<br><br>Defendants. | Case No.<br><br>**COMPLAINT: CIVIL RIGHTS**<br><br>**42 U.S.C. § 1983 AND FOURTH, FIFTH AND FOURTEENTH AMENDMENTS**<br><br>**CALIFORNIA CONSTITUTION ARTICLE I, §§ 7 AND 13**<br><br>**CALIFORNIA CIVIL CODE §§ 52, 52.1**<br><br>**CONVERSION**<br><br>**TRESPASS TO PROPERTY** |

## JURISDICTION AND VENUE

1.      This is an action for injunctive relief and damages pursuant to 42 U.S.C. § 1983, based upon ongoing violations by the defendants of the rights secured to plaintiffs by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution. Jurisdiction exists based on 28 U.S.C. §§ 1331 and 1343 in that this case is brought pursuant to 42 U.S.C. § 1983 and raises questions of federal constitutional law. The court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in the Central District in that the events and conduct complained of in this action occurred in the Central District.

## PRELIMINARY STATEMENT

3.      The City of Los Angeles is currently enjoined from seizing property from homeless people in violation of their Fourth and Fourteenth Amendment rights. *See Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D.Cal. 2011) *affirmed by Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012).  This is the third time in the past thirty years that the Court has restrained the City of Los Angeles from seizing homeless people's property in the Skid Row area of Downtown Los Angeles.  *See also Adam Young Bennion v.  City of Los Angeles*, C637718 (LA Sup. Ct., February 25, 1987); *Justin v. City of Los Angeles*, CV 00-12352 LGB (C.D.Cal. 2001) (AIJx).)  The current injunction against the City is the result of explicit holdings by both the District Court and the Ninth Circuit Court of Appeals that it is a violation of the Fourth and Fourteenth Amendments to seize a homeless person's property that is not abandoned, or to seize abandoned property without notice or due process.  *Lavan*, 797 F. Supp. 2d at 1020; *Lavan v. City of Los Angeles*, 693 F.3d at 1030.

4.      Despite clear language from the Court that such behavior is unconstitutional, the Los Angeles Downtown Industrial District Business Improvement District, a special assessment district created by the City of Los

Angeles pursuant to California Streets and Highways Code § 36600, and its agent, the Central City East Association, with cooperation and participation by the City of Los Angeles, have engaged in a long-running campaign to seize homeless people's unattended property.  BID officers take property they have no reason to believe is abandoned or creating a health and safety risk.  They do so with no notice of any kind to individuals that their property will be taken.  By design, the seizures serve no purpose other than to make life even harder for homeless residents in the BID, and individuals who live on the street cannot reasonably predict when their property will be taken or prevent it from happening.  These actions are in clear violation of individuals' rights under the United States Constitution.

5.     In the face of these violations, yet another group of plaintiffs is forced to come before a Court to seek protection against these violations and the conditions created by defendants because of the seizure of their possessions.

6.     Plaintiffs are four homeless individuals and two organizational plaintiffs who live or operate in the area of Los Angeles known as Skid Row, which is largely encompassed by the Los Angeles Downtown Industrial District (LADID). It also has one of the largest concentrations of homeless people in the area as well as one of the largest concentrations of service providers that provide food, shelter, and other services to homeless people in the area.

7.     Like many other homeless individuals in Skid Row, the plaintiffs keep all of their worldly possessions with them during the day and use blankets and tents to shelter themselves at night.  Although they each attempt to stay with their property as much as possible during the day, it is virtually impossible for them to stay in one place at all times, or to take their possessions with them wherever they go.  They have no choice but to leave their property unattended to get food, use the restroom, attend court proceedings, and get medical treatment for ailments that are by all accounts made worse by their life on the streets.  Defendants are aware that

homeless people must leave their property unattended at times during the day to attend to the necessities of life.

8.     When plaintiffs do leave their property, they risk having their property seized by the LADID and the CITY, which with no notice and seemingly at random, seize homeless people's unattended but clearly not abandoned property. Over the course of the last two years, the individual plaintiffs have all had their property seized by LADID's public safety officers who are performing municipal services in the LADID.  In each instance, the plaintiffs' property was neatly packed up, and plaintiffs were gone for only a short period of time.  When they returned, they each found their property had been seized.  They had no way of knowing their property would be taken when they were gone, and they had no way to prevent it. In one instance, one of the plaintiffs left a sign on his property, as he was told to do by the BID, stating that his property was not abandoned, yet his property was taken none-the-less.

9.     When their property is taken, individuals are often not given notice where their property is taken or how to retrieve it.  When they do discover that their property is being held at a storage facility, they are then forced to retrieve it from the facility, which is located more than a half mile away from where many homeless people stay.  What was hauled away in a truck, plaintiffs must then carry back, unassisted, to the place where they reside.  In the heat of the day or for individuals with mobility issues or health problems, this is a nearly impossible task.  It is made even more difficult because defendants seize and will not return any shopping carts used by individuals to cart or store their property or which were used as ambulatory assistance.  This includes carts given to people by the Los Angeles Catholic Worker specifically for this purpose.

10.    These BID officers, acting under color of law, seize this property in accordance with the LADID's policy of taking unattended property in the BID. The CITY has conspired with LADID and participated in and ratified these actions.

Together, the LADID and the CITY have deprived the individual plaintiffs of their property, in complete disregard of plaintiffs' Fourth and Fourteenth Amendment rights and in direct contravention of the Ninth Circuit's mandate in *Lavan* to ensure that these rights are protected.  Defendants are doing so as part of an ongoing campaign to make the streets less hospitable to the homeless residents of Skid Row, and as a result of these seizures, which plaintiffs cannot predict or prevent, they are more hesitant to leave their property during the day to seek medical care, get case management, attend court hearings, or even get food or perform personal tasks.

## PLAINTIFFS

11.     Plaintiff Los Angeles Catholic Worker (LACW), founded in 1970, is an unincorporated lay Catholic community of women and men providing services to homeless residents of Skid Row since its founding. Each week LACW provides free meals to as many residents as resources allow.  They provide these meals at their building on the corner of 6th Street and Gladys Avenue, which is nicknamed the "Hippie Kitchen" and is located in the area covered by the Los Angeles Downtown Industrial District Business Improvement District.  In addition to providing meals through the Hippie Kitchen, LACW provides hospice care for the dying, operates a dental clinic, and provides much-needed foot care to homeless people who spend significant time on their feet, often in worn and ill-fitting shoes. LACW provides toiletries, over-the-counter medications, and other tangible items to people in need.

12.     LACW also provides shopping carts to homeless residents of Skid Row.  The carts are loaned to homeless individuals who use the carts to move and store their personal possessions and as assistance for the many individuals in Skid Row with ambulatory disabilities. LACW purchases the bright red carts with their name embossed on the handle, and places laminated signs indicating they are "Shopping Carts for the Homeless".  The signs are attached in accordance with

Business and Professions Code § 22435.1 and provide notice to law enforcement and others, including the LADID officers that the shopping cart is owned by Los Angeles Catholic Worker and used with permission by homeless individuals in Skid Row.

13. As a result of the policies and the practices of the LADID, CCEA and the CITY to illegally seize people's property, including their shopping carts, the LACW has had to expend worker time and resources to get their carts back from the LADID.  In addition, because carts are rarely returned after being seized by the BID officers, LACW has had to replace these carts.  LACW has also had to replace toiletries and other tangible items that are taken when property is seized.  These expenditures have diverted resources from other activities.  In addition, defendants' illegal policies and practices have frustrated LACW's mission of providing food and services to homeless residents of Skid Row.  Defendants' policies of seizing unattended property make it more difficult for people to leave their belongings when they seek services in Skid Row, including getting food from the Hippie Kitchen.  Finally, these policies have frustrated LACW's mission of ensuring that that homeless people are treated with dignity and respect by, among other things, disrespecting their rights and creating a hostile environment for homeless people living in Skid Row.

14. Plaintiff CANGRESS, aka The Los Angeles Community Action Network ("LA CAN") is a grassroots, non-profit organization operating and organized under the laws of the State of California.  Its members include over 800 poor people in Skid Row, many of whom are homeless residents in Skid Row. The organization's main purpose is to organize and empower community residents to work collectively to address systemic poverty and oppression in their community. Since its founding in 1999, LA CAN has operated as the only member-driven organization in Skid Row whose goal is to protect the rights and prevent the further disenfranchisement of homeless and poor people in Los Angeles.  LA CAN brings

this action on behalf of its members whose property has been seized by BID officers as part of defendants' policies and practices of seizing unattended property in Skid Row.

15.    Plaintiff Harry James Jones is a 63-year-old disabled Vietnam War veteran who suffers from chronic medical conditions such as high blood pressure, glaucoma, diabetes, and PTSD.  He was homeless for nearly 40 years, since he was honorably discharged from the Marine Corps in 1975.  He resided in the Skid Row area for most of that time.  Mr. Jones has had all of his personal property seized by LADID officers on at least three occasions.  Each time, the BID officers failed to leave him notice that his property was taken, and as a result, he was unable to retrieve his property.

16.    Plaintiff Louis Grady is a 51-year-old homeless man who fell on hard times last year and has been living on the streets of Skid Row since then.  Although he works to support himself by doing odd jobs and collecting recycling, he does not earn enough to afford an apartment. Mr. Grady has had his personal property seized by BID officers on at least two separate occasions in the past year while he momentarily stepped away to perform life-sustaining activities.

17.    Plaintiff Lloyd Hinkle is a 61-year-old Vietnam War veteran who has lived in Skid Row for approximately a year. Since he started living on the streets, he has kept all of his personal belongings with him in shopping carts, but leaves them to get food and run other errands because he cannot take them with him into the missions or other agencies from which he receives services.  On or about June 30, 2014, BID officers and LAPD officers took Mr. Hinkle's property.  He was provided no notice of the seizure, and the BID and LAPD officers were repeatedly informed that his property was not abandoned but took it anyway.

18.    Plaintiff Walter Shoaf is a 62-year-old veteran who suffers from chronic pain and Post Traumatic Stress Disorder as well as other mental health issues.  He has been homeless and residing in the Skid Row area since he was

discharged from the army nearly 40 years ago.  In February 2014, Mr. Shoaf left his property for a short time to run an errand.  As he was returning to his property, he saw the BID officers loading all of it into a truck.  By the time he got to the place where he stays, they had loaded up his things, taking his property, including his military identification card and his tent.  Although he tried to stop them, the BID officers ignored him, and they left him no notice where to retrieve his possessions.

## DEFENDANTS

19.     Defendant Los Angeles Downtown Industrial District (LADID) is a Business Improvement District (BID) initially created by the City of Los Angeles in 1998, pursuant to California Streets and Highways Code Section 36600 *et seq*. *See* Los Angeles Municipal Ord. 172155.  LADID's boundaries are roughly between 3rd St. and 8th St. and Olympic to the North and South, and San Pedro and Alameda to the west and east.  The current BID was authorized through the passage of Los Angeles Municipal Ordinance 180801. The LADID is funded by the City of Los Angeles through an assessment on property owners located within the BID.

20.     Defendant Central City East Association ("CCEA") is a 501(c)(6) not-for-profit business corporation contracted by the City of Los Angeles to manage the LADID.  CCEA maintains offices in the City of Los Angeles. At all times relevant to this action, the LADID and CCEA, operating as the agent of LADID, acted under color of state law.

21.     Defendant the City of Los Angeles ("CITY") is a municipal entity organized under the laws of the State of California. The CITY is a legal entity with the capacity to sue and be sued. The CITY created the LADID and has authorized and/or ratified all of the actions of the LADID alleged herein.  The LADID and the CCEA act as agents of the CITY and have conspired with the CITY to violate plaintiffs' rights.  The departments of the City of Los Angeles include the Los

Angeles Police Department, employees of which have also engaged in acts constituting the violations of plaintiffs' rights alleged in this action.

22.   The identities and capacities of defendants DOES 1 through 10 are unknown to plaintiffs.  Plaintiffs, therefore, sue these defendants by fictitious names.  As to all defendants sued by fictitious names, plaintiffs will give notice of this Complaint and their true names and capacities when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and were at all times relevant herein, other corporate or business entities, agents, successors in interest, assigns, representatives, principals and/or employees of the defendants and are responsible for the acts and omissions resulting in the violations alleged in this complaint.  Defendants DOES 1 through 10 are sued in both their official and individual capacities.

23.   Each of the defendants acted as joint actors with joint obligations, and each defendant was and is responsible for the conduct and injuries herein alleged.

24.   Each of the defendants acted, alone or together jointly, under color of law.  The CITY has delegated traditional municipal functions, including additional sanitation and security services, to the LADID through the adoption of ordinances and pursuant to state law, and the CCEA, acting as an agent of the LADID, performs those municipal functions.

## HISTORY AND STRUCTURE OF THE LADID

25.   The Los Angeles Downtown Industrial District Business Improvement District was created by the City of Los Angeles pursuant to the Property and Business Improvement Area Law, codified as California Streets & Highways Code §§ 36600 *et seq.*[1]

_____

[1] All statutory citations are to the California Streets and Highways Code unless otherwise noted.

26.     The purpose of the Property and Business Improvement Area Law is to promote the economic revitalization and physical maintenance of the business districts of its cities in order to create jobs, attract new businesses, and prevent erosion of the business districts and promote tourism. § 36601(b). To facilitate this, the law "provides an alternative method of financing certain improvements and activities" in an area of a city by allowing it to create BIDs.  Cities are then authorized to levy assessments on businesses in the area. § 36617.  The funds collected are in turn used to finance the improvement of public facilities within the district,[2] including maintaining or creating public parks, trash receptacles and public restrooms, widening city streets, and creating facilities or equipment to enhance security of persons or property within the area.  Funds can also be used for maintenance and activities[3] in the district.  § 36601(b).  Activities specifically contemplated include providing security, sanitation, graffiti removal, street and

---

[2] Improvement under the statute is defined as "the acquisition, construction, installation, or maintenance of any tangible property with an estimated useful life of five years or more."  § 36610.  Contemplated public facilities include parking facilities, benches, trash receptacles and public restrooms, street lighting, decorations, parks and fountains, closing, opening, widening or narrowing of existing streets, facilities or equipment, or both, to enhance security of persons and property within the area. *Id.*

"'Activities' means, but is not limited to, all of the following:
(a) Promotion of public events which benefit businesses or real property in the district.
(b) Furnishing of music in any public place within the district.
(c) Promotion of tourism within the district.
(d) Marketing and economic development, including retail retention and recruitment.
(e) Providing security, sanitation, graffiti removal, street and sidewalk cleaning, and other municipal services supplemental to those normally provided by the municipality.
(f) Activities which benefit businesses and real property located in the district. § 36613.

COMPLAINT

sidewalk cleaning, and other municipal services supplemental to those normally provided by the municipality. § 36613.

27.    The CITY established the LADID pursuant to § 36600 with the passage of Ordinance 172155 in 1997. The LADID was subsequently renewed by the CITY in 2003 and 2009. Los Angeles Municipal Ord. 175398, 180801.  The present BID was renewed through December 31, 2014.  *See* Los Angeles Municipal Ord. 180801.  On July 30, 2014, the CITY approved the renewal of the LADID for a period to run through December 31, 2021.  *See* Los Angeles Municipal Ord. 183156; *see also* Los Angeles Municipal Ord. 183068 (incorporating the 2014-2021 Management District Plan).  As required under the state statute, the enabling ordinance incorporated a Management District Plan, which outlined the approved activities of the BID for the duration of the BID.  Only the CITY has the authority to approve or change the LADID's Management District Plan.

28.    When the CITY approved the current BID, it approved a yearly levy of approximately $1.8 million in special assessments on businesses in the district in order to pay for the services outlined in the Management District Plan.  *See* Ord. 180699.  Under state law and the operating ordinance, those funds can only be used to perform the municipal services outlined in the Management District Plan, which is incorporated by reference into the enabling ordinance.  *See* Ord. 180801, Sect. 11; Ord. 180,699.

29.    According to the Management District Plan, CCEA is designated as the Owner's Association, which contracts with the CITY to administer the LADID in accordance with the Management District Plan.

30.    The special assessments levied by the CITY to pay for LADID activities are collected by the County of Los Angeles through its annual property tax assessment, and failure to pay the assessment results in a tax lien on the property.  All municipal services provided by the LADID are paid for by the CITY

with funds collected pursuant to the special assessment.  Los Angeles Municipal Ord. 18086.

31.    Under the current Management District Plan, a vast majority of the LADID's focus is on its Clean and Safe Programs.  Seventy seven percent of the assessments on a yearly basis go to Clean and Safe Programs.

32.    The Clean and Safe program includes two components: an enhanced security program dealing with crime prevention and inappropriate conduct in the district, and an enhanced maintenance program, which provides amongst other services, sanitation and maintenance services to the public streets and sidewalks in the District.

33.    The LADID provides personnel to patrol the streets of the LADID and to perform the municipal services outlined in the Management District Plan, as approved by the CITY.  These "BID officers" are frequently referred to as "Red Shirts" because of the red shirts they wear to signify that they are BID officers for the LADID, although supervisors wear black shirts.  As provided for in the current Management District Plan, BID officers provide both public safety and maintenance in the public areas of the district.

34.    BID public safety officers wear red shirts that say "Public Safety" on the back and wear badges.  These officers patrol the streets in the 44 block area of the district on bicycles.  Pursuant to the Management District Plan, the purpose of the public safety officers is to "prevent, deter, and report illegal activities taking place on the streets, sidewalks, storefronts, parking lots and alleys."  According to CCEA, BID officers are tasked with "controlling unsuitable street and alley behavior" and "enforcing cleanliness and other street code compliances."  The officers routinely cooperate with LAPD in the apprehension and arrest of violators of these laws and provide police assistance as needed.  BID officers assist in crime suppression and prevention, including assisting in the "prevention of break-ins, automobile-related crimes and generally disruptive street elements."  BID officers

are connected via two-way radio to a dispatcher who can dispatch the BID officers to locations throughout the BID.  The BID officers and dispatch maintain communication with the LAPD area patrols.

35.    Other BID officers perform sanitation services for the district, including trash removal, graffiti removal, sidewalk cleaning/weed abatement and abandoned property removal.

36.    LADID also employs a fleet of trucks, which are dispatched to assist BID officers and LAPD with the seizure, storage, and destruction of homeless individuals' personal belongings.

## HISTORY OF PROPERTY SEIZURES AND INJUNCTIONS
## IN DOWNTOWN LOS ANGELES

37.    The deploying of LADID BID officers and their trucks to seize homeless people's property is only the latest step by the CITY to "clean up the streets of Skid Row."  Over the past 30 years, the CITY has repeatedly engaged in campaigns purportedly to address public health and sanitation in the area, but in doing so, has repeatedly implemented its programs in a way that has repeatedly led to the deprivation of the rights of homeless people living on the streets in Downtown Los Angeles.

38.    In 1987, homeless residents of Skid Row filed a lawsuit to enjoin the CITY from illegally seizing their property, which resulted in a restraining order against the CITY's seizures of people's property.  *See Young Bennion v. City of Los Angeles*, C637718, Exh. A. The terms of the restraining order included a requirement that the City give 12 hours written notice before removing property on the presupposition that it has been abandoned on the public streets of Skid Row. Exh. A, p.2("III. Notice Requirements"). The *Bennion* Order required City employees to post a "prominent notice in a conspicuous place at the site before the property is seized. The notice shall include the specific citation to the law allegedly

violated and state that the property will be subject to disposal if the violation is not corrected within twelve hours from the time the notice is posted." *Id*.

39.     In 2000, the CITY again began a campaign of confiscating the property of homeless persons, ordering them to move away from their belongings, and then immediately crushing all of the property in dump trucks. In response, several individuals filed a lawsuit entitled *Justin v. City of Los Angeles*, CV 00-12352 LGB (AIJx), Exh. B. On November 5, 2001, Judge Lourdes Baird entered a permanent injunction against the CITY, incorporating the terms of the *Bennion* restraining order and enjoining the CITY to

> not confiscate personal property that does not appear abandoned and destroy it without notice. Where applicable, defendants will give notice in compliance with the temporary restraining order issued in *Bennion v. City of Los Angeles* (C637718). Any personal property that does not appear intentionally abandoned collected by defendants will be retained for 90 days as provided in California Civil Code section 2080.2.

Exh. B, p.2.

40.     At the request of the CITY, the injunction expired after 48 months. *Id*.

41.     Yet again, in February 2011, CITY employees from the LAPD and the Bureau of Street Services began seizing and summarily destroying property they came upon on the public sidewalks of Skid Row, without any evidence that the property had been abandoned, and without any notice or due process to the owners of the property.

42.     In April 2011, eight homeless individuals filed another lawsuit against the CITY on behalf of themselves and all others similarly situated.  The lawsuit, *Tony Lavan, et.al. v. City of Los Angeles* (CV1102874), alleged, *inter alia*, that the CITY violated their Fourth and Fourteenth Amendment rights by seizing and

destroying their property, which they temporarily left on the public sidewalks while they attended to necessary tasks.

43.     On June 21, 2011, U.S. District Court Judge Phillip Gutierrez granted the plaintiffs' request for a preliminary injunction and enjoined the City from

a. Seizing property in Skid Row absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, or is evidence of a crime, or contraband; and

b. Absent an immediate threat to public health or safety, destruction of said seized property without maintaining it in a secure location for a period of less than 90 days.

*Lavan,* 797 F. Supp. 2d at 1020, Exh. C, p. 16.

44.     The injunction was affirmed by the Ninth Circuit on the ground that the taking of unabandoned property constituted a seizure under the Fourth Amendment, and that it was a deprivation of the plaintiffs' due process rights to take people's property without notice:  "Government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking."  693 F.3d at 1032.  As a result, the injunction remains in effect today, and the litigation is ongoing.

**PROPERTY SEIZURE BY THE LADID**

45.     Although the CITY remains enjoined from seizing property that is not abandoned, presents an immediate threat to public health or safety, or is evidence of a crime, or contraband, and from destroying abandoned property without notice and due process of law, BID officers, acting under color of law and in coordination with the CITY and its agent, the LAPD, have continued the CITY's campaign of seizing homeless people's property.

46.     As part of the municipal services provided by the LADID, BID public safety officers routinely seize unattended property on the streets.  The property the BID officers seize is often left for only minutes at a time by individuals who have

no choice but to leave their property on the streets while they are getting a meal at a mission in the District, attending an appointment, or even using the restroom.

47.     The BID officers make no effort to determine how long property has been unattended or whether property is abandoned before they remove the property.  Property could be unattended for as little as a few minutes or a few hours before it is seized. They seize property that no reasonable person could believe is abandoned.  On information and belief, the BID officers do not take into account any indicia that property is not abandoned, such as its appearance or whether it is packed neatly in a shopping cart, before property is seized.  Nor do BID officers ask individuals in the vicinity whether the property is abandoned.  BID officers ignore statements from neighbors that property is not abandoned or that the owner of the property has stepped away for only a moment.

48.     BID officers provide no notice of any kind to the community that it is conducting sweeps at any particular time, and the seizures are not pursuant to any established maintenance schedule that is made public in any way.  Nor do BID officers provide notice to any individuals that their property will be taken prior to its seizure.  The BID officers will seize a single person's property on a block but leave all the other property alone.  An individual who is living on the street has no way of discerning when or if his or her property will be taken, and has no way of avoiding a seizure by the BID officers if they must leave their property to perform vital tasks like going to the restroom, getting a meal, or receiving medical care or case management services from entities that frequently do not allow people to bring in their property when they are accessing services.

49.     BID officers routinely seize property at times that they know or should know that individuals will be away from their property for brief periods of time, including at times when area missions provide meals.

50.     Unlike when property is seized by the CITY's Bureau of Street Services, which the CITY has previously contended is not fast-moving and as

such, it is therefore apparent that street cleaning is underway, when BID officers seize property, it is extremely fast.  BID officers can identify, tag, and seize a person's property in five minutes.  If a person returns while the BID is removing the property, BID officers will not give the property back, and if individuals attempt to intervene either on their own behalf or on behalf of others, LAPD is called or stop on their own and prevent people from intervening or protesting with threats of arrest.

51.     When BID officers take property, they sometimes, although not always, leave an "unattended property receipt" which states that property can be reclaimed from the LADID's warehouse on 7th Street and Central Avenue.   The notice provides no other information about why the property was taken and states only that the property was "unattended."  When the BID officers leave a receipt, they may stick it on a wall above the location from where the property was seized, but individuals often do not receive the receipt.  On information and belief, BID officers do not consistently make any other attempts to ensure that the individual whose property was taken is notified that the property was seized.  This is true even though the BID officers ride or walk through the same streets frequently and interact with the owners of the property.

52.     LAPD officers conspire with the LADID in the seizure of property. They alert BID officers where and when homeless individuals' property is unattended.  They also directly participate in the seizures by standing at attention while the property is seized, interfering with individuals' protests when property is taken, and threatening individuals with arrest if they interfere with the BID officers' attempts to take property.  LAPD has also repeatedly refused to take statements or file reports for theft by individuals whose unabandoned property has been taken by the BID officers.  These actions were taken pursuant to an official custom and policy of the LAPD.

53.     According to CCEA, after BID officers seize individuals' property, it is taken to a warehouse on 7th Street and Central, where facility staff go through the items seized by the BID officers.  Items the staff deem perishable, soiled or wet are destroyed.  CCEA claims that other items are re-bagged and held at the facility for no more than 90 days.

54.     Although the Unattended Property Receipt directs individuals to the "Personal Property Storage Facility," a facility operated by CCEA which allows people to store a single bin of property during the day, property that is seized is not stored in the same area as the bin storage, and it cannot be accessed through the entrance on 7th Street.

55.     Instead, seized property is stored in a separate section of the storage facility, which is controlled by the LAPD.  Individuals picking up property confiscated by the BID are instructed to pick up their property from the LAPD Property Pickup section of the facility located on Industrial Street.  This entrance is also controlled by the LAPD.   The receipt indicates that property can be retrieved Monday through Friday from 8:00 a.m. to 4:00 p.m.; however, the posted hours of the facility are more circumscribed and states that it is closed on Monday, Saturday and Sunday, and only open only from 8:00 a.m. to 1:00 p.m. on Tuesday through Friday.

56.     An individual seeking to retrieve their property must present the "unattended property receipt".  On information and belief, without a receipt, the CCEA is frequently unable or unwilling to return an individual's possessions.

57.     When individuals whose property is seized and who are able to locate an unattended property receipt attempt to retrieve their property, they are not informed why their property was taken.  Nor are they shown or given a copy of any inventory taken of property seized or destroyed.  They are however required to sign a form which states that "I have examined the contents of the bag containing

my property and confirmed that all property is accounted for." and it is defendants' policy not to return any property unless an individual signs that statement.

58.     Defendants operate a strict "all of it or none" rule, in which individuals retrieving seized property may only take all of their possessions or none of their possessions.  An individual is not allowed to retrieve critical items like a wallet or medication without either taking all of his or her property or surrendering the property they cannot retrieve at that time and allowing it to be destroyed.  Therefore, if an individual has too much property to carry in one trip, he or she must leave the property unattended on the street or surrender it for destruction.

59.     Unattended property that is seized and taken to the facility is retained for 90 days.  If it is not claimed during that time period, it is destroyed.

## INDIVIDUAL PLAINTIFFS' SPECIFIC ALLEGATIONS
### HARRY JAMES JONES

60.     On or about March 1, 2013, plaintiff Harry James Jones stepped away from his property, as he did every day in order to get food or to receive the vital services necessary to survive.  As he did every day, he left his property neatly packed in the area where he stayed every night, on Towne Avenue near 3rd Street.

61.     There were no posted signs indicating that the streets would be cleaned or cleared while he was gone.  He was away from his property for only a short period of time. While he was gone, BID officers seized all of his personal property, including his identification card, his life-saving medication, his tent, and his clothing.  The BID officers provided Mr. Jones with no notice that his property would be taken before they took his property, and when he returned, there was no notice posted on the wall where his items were previously located.  Based on the way his property was packed at the time, there was no objectively reasonable basis to believe that the property was abandoned.  Nor was there any objectively reasonable basis to believe that the property caused an immediate threat to public

health or safety, or was evidence of a crime, or contraband.  On the contrary, the seizure of Mr. Jones's property, including his medication, created a threat to Mr. Jones's health.

62.     Because he had his property taken by the BID officers before, Mr. Jones understood that he should be able to obtain the property from the warehouse at 7th and Central.  However, when he went to retrieve his belongings, he was told they could not assist him because he did not have his "ticket."

63.     As a result of this seizure of his property, Mr. Jones went without his medication for approximately one month.  He was unable to refill his prescription because his identification card was seized along with his medication.  He became very ill as a result of his lack of medications and was hospitalized for several days.

64.     On or about December 30, 2013, Mr. Jones again stepped away from his property to get a meal, as he had done every day for the preceding months without incident.  While he was gone, BID officers once again came to the place he resided and seized all of his property.  There was again no notice given before his property was taken and no notice left afterwards, and Mr. Jones was once again unable to obtain his property after it was seized.

65.     As a result of the seizures of his property, including his military identification card and his medication, Mr. Jones suffered from severe health consequences.  He also suffered emotional distress and continues to suffer from severe anxiety that he will once again lose his property and suffer another medical setback as a result.

**LOUIS GRADY**

66.     On or about January 15, 2014, Louis Grady left the area where he resides on the sidewalk at 531 Towne Avenue to get lunch at the Midnight Mission.  Before he left, he packed his belongings in two LACW carts.  He wrote a note and posted it in front of his belongings to inform the BID officers that his property was not abandoned, as was his practice every time he left his things.  He

left the note because he knew that BID officers randomly seized property and had been told by a BID supervisor that he should leave a note to alert the BID officers that his property was not abandoned.

67.     Mr. Grady was gone for approximately 30 to 45 minutes.  When he returned, all of his possessions were gone, including the LACW carts, his tent, his blankets, his laptop computer and cell phone, and his personal journal.  A notice was posted on the wall behind where his things had been located, indicating that BID officers had taken his belongings to a warehouse.

68.     When Mr. Grady attempted to retrieve his property from the warehouse, he discovered that several items were missing, including his tent, his laptop, his cell phone and his journal.  The LACW carts were also not returned to him.  He was not given an inventory of the property that had been seized, and when he complained about the missing items, he was asked to leave.

69.     Because Mr. Grady was not given any carts back, it was very difficult for him to transport his property back to the place he stays.  He has a chronic knee condition that makes walking difficult.  He uses a cane and relies on the carts from the Hippie Kitchen to provide ambulatory assistance when moving his belongings.  Without the carts, it took him hours to transport the property returned to him to the place where he stays.  He could not carry the property back in a single trip, and so he was forced to move his belongings one bag at a time.  He left the remaining bags on the street, unattended.

70.     On another occasion several months later, Mr. Grady had other items seized by BID officers under similar circumstances.  He attempted to submit a complaint to the LADID, but he never received a response to or even an acknowledgment of his complaint.

71.     As a result of the property seizures, Mr. Grady has suffered emotional distress and anxiety.  He is less willing to leave his property on the street and as a

result, he has sometimes missed doctor's appointments and meals for fear that when he is gone, his things will be taken by the Red Shirts.

### WALTER SHOAF

72. In February 2014, Mr. Shoaf stepped away from his property, which he kept neatly packed where he stays on Towne Avenue near 6th Street.

73. He was gone for less than an hour. As he was walking back to his property, Mr. Shoaf witnessed the BID officers seizing his property, including his identification card and his medication. They were also packing up his tent, his extra clothing, and all of his other possessions. Mr. Shoaf attempted to reach the BID officers and tell them that his property was not abandoned, that the things belonged to him and that he did not want them to take it. By the time he reached them, the BID officers were almost finished loading it in the truck, and they drove away with his property.

74. The BID officers did not provide Mr. Shoaf any information as to where they were taking his property or where he could retrieve it. As a result, he did not know he should be able to retrieve his property from the warehouse. He was forced to go without his medication for several weeks. He was also forced to sleep in the cold without a tent or blankets.

75. The loss of his property caused him extreme distress, discomfort, and pain.

### LLOYD HINKLE

76. On June 30, 2014 at around 12:00 p.m., Lloyd Hinkle left his property neatly packed under a tarp on 5th Street between Gladys and Stanford. Mr. Hinkle ensured that his property was out of the way and not blocking the sidewalk. He then walked across the street to get lunch and on the way, passed BID officers. He was not concerned that his property would be taken because it was clearly packed up, his neighbors knew he was in the area, and there was no notice anywhere of

any street cleaning or that property could be seized if left unattended.  He also knew that he would not be gone long.

77.     After Mr. Hinkle walked away, the BID officers approached the first property on the corner of Fifth Street and Gladys and began writing a receipt for the property, which belonged to Mr. Hinkle's neighbor.

78.     The BID officers placed the receipt on the fence behind the neighbor's property and began to pack up the property.   However, the property owner  was present and confronted the BID officers who instead placed the receipt on Mr. Hinkle's property, which was down the block.  While the BID officers were writing the receipt, they were joined by additional BID officers driving two pickup trucks.  The BID officers then began packing up Mr. Hinkle's things.

79.     Mr. Hinkle's neighbor informed the BID officers that Mr. Hinkle's property was not abandoned and that he was watching the property for Mr. Hinkle but the BID officers ignored him.  Staff and members of LA CAN recorded the incident on video; they also informed the BID officers that the property was not abandoned, but they were ignored as well.

80.     The BID officers were joined by two Los Angeles Police Department officers who parked their cruiser on the street and told the individuals present, including Mr. Hinkle's neighbor and LA CAN members and staff, to move back and allow the BID officers to do their jobs.  When the LA CAN staff member said that the BID officers were stealing Mr. Hinkle's property, Officer Zambrano informed them that no one was stealing any property.

81.     Officer Zambrano placed herself between Mr. Hinkle's neighbor and the BID officers who were packing up the property.  She prevented him and LA CAN from intervening.  She informed them that "we're going to take someone's property that is abandoned."  During this interaction, another LAPD officer also was present while the BID officers seized Mr. Hinkle's property.

82.     Within five minutes, the BID officers and the LAPD, acting in concert, loaded Mr. Hinkle's property in the back of the white trucks, and the trucks drove away.  The remainder of the BID officers rode away on their bicycles. The LAPD officers stood watch and remained on the scene until after all of the BID officers left.

83.     When Mr. Hinkle returned less than a half hour later, his possessions were gone, and he was left with only a receipt for his property. The items that were taken included shopping carts, tarps and his bed roll, his sleeping bag, clothes, toiletries and medicine.

84.     The seizure of his property caused Mr. Hinkle to suffer extreme discomfort and emotional distress as everything he owned including the items he used to create shelter had been taken.  Although he was able to ultimately retrieve most of his property from the facility on 7th and Central, it was extremely difficult for him to do so.  The CCEA did not return his shopping carts, and he had no way to transport his possessions.  What had taken two CCEA trucks to take to the facility, Mr. Hinkle was left on his own to bring back to the place where he stays. It took him multiple trips from the storage facility, and he was forced to leave his property unattended each time he went to get another load of his possessions.

## DEFENDANT CITY'S LIABILITY

85.     These actions took place pursuant to the customs, practices, procedures, and policies of the defendants.  The LADID is a special assessment district created by the CITY pursuant to its authority under state law, to provide for the provision of municipal services, and CCEA is an agent of the LADID and the CITY.  Defendant CITY conspired with the LADID and CCEA to commit the above offenses.  Moreover, defendant CITY's employee police officers regularly participated, through threats and intimidation, in torts committed by the other defendants.

86.     Defendants CITY and LADID have engaged in a conspiracy to remove unattended property from the streets of Skid Row.  This conspiracy has continued since the *Lavan* injunction was imposed on the CITY.  On information and belief, the CITY and its officers and/or agents urged the BID to remove homeless individuals' property on Skid Row.   The CITY acts in concert with the BID to identify property to be removed and to ensure that the removals were not stopped or hindered.

87.     In addition, the CITY failed to train its officers that they should not aid and abet the conversion or trespass of BID officers taking property that is not abandoned.  The CITY failed to properly train officers to determine when property may or may not be removed.  The CITY instead maintained a policy of removing homeless people's property from Skid Row, regardless whether it was not abandoned, not blocking the sidewalks, or otherwise constituting a health and safety violation.  The CITY failed to adequately train its officers to take police reports concerning these actions, and instead maintained a policy that it would not take reports concerning BID officers' removal of property.

88.     Plaintiffs have repeatedly placed the CITY on notice of the LADID's actions.  The CITY has taken no actions to constrain defendants' illegal acts, despite authority under state law to do so and therefore ratified the actions of the LADID and the CCEA.

89.     LAPD, a department of the CITY, have refused to take complaints from individuals whose personal property has been seized in the manner described above.  LAPD intentionally conspired with the LADID in the removal and storage of property that was not abandoned.  In the case of Mr. Hinkle, and in other cases like his, LAPD officers were present to aid in the removal of property.  Officers working in Skid Row have provided materials to BID officers to assist in the seizure of property.

90.     Plaintiffs Jones, Grady, Shoaf, and Hinkle provided notice of defendant LADID and CCEA's actions by submitting a Government Tort Claim to the CITY pursuant to Government Code Section 916.  On information and belief, defendant CITY has not taken any action on these claims.  During the summer of 2013, plaintiffs Los Angeles Catholic Worker and Louis Grady, as well as other homeless advocates and homeless individuals attended the July and August Los Angeles Homeless Services Authority, Board of Commissioner  meetings, where an extension of  a contract with the LADID was discussed.   At these meetings, plaintiffs LACW, Mr. Grady, and LA CAN and its members, and others testified, verbally and in writing, about the LADID's illegal practice of seizing personal property despite and in circumvention of the *Lavan* injunction.  They also testified that the BID officers were committing the common law tort of conversion. The Los Angeles City Attorney advised LAHSA regarding the seizure of property and testified that CCEA was in compliance with the *Lavan* injunction.  Despite the complaints articulated at the meeting and evidence of the unlawful seizures, the LAHSA Commission voted to renew the contracts, without adding any language regarding the storage of unlawfully seized property.

91.     Subsequent to the filing of claims against the CITY and the LADID, the CITY renewed the LADID on July 30, 2014 for another seven years.   As such and by not taking any action to disestablish the LADID as it retains the sole authority to do pursuant to § 36670, defendant CITY has ratified the actions of the LADID and its agent, CCEA.

## FIRST CAUSE OF ACTION
**Right to Be Secure From Unreasonable Seizures**
**42 U.S.C. §1983 - Fourth Amendment; Art. 1,**
**§13, California Constitution**
**Against All Defendants**

92.     Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91 as though fully set forth herein.

93.     Defendants violated plaintiffs' Fourth Amendment right to be free from unreasonable seizure of their property by taking plaintiffs' property without proper justification and without any authority to do so.

94.     Defendants' actions at all times were under color of law.

95.     Defendants' unlawful actions, through the conduct of their employees, were done with the specific intent to deprive plaintiffs of their constitutional rights to be secure in their property.

96.     Plaintiffs are informed and believe that Defendants' employees and agents are seizing property intentionally without a lawful justification or authority to do so, or at least defendants were deliberately indifferent to the likely consequence that the property would be seized without lawful justification or authority to do so, based on the past circumstances of similar constitutional and statutory violations of the law, and in light of an existing injunction against such actions.

97.     As a direct and proximate consequence of the acts of defendants' agents and employees, plaintiffs Harry James Jones, Lloyd Hinkle, Walter Shoaf, and Louis Grady have suffered and continue to suffer injury and loss.  These plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourth Amendment rights.

98.     Plaintiffs are also entitled to injunctive relief prohibiting defendants from seizing their property in the future.  Plaintiffs are informed and believe that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law. Members of LA CAN, and individual plaintiffs Lloyd Hinkle, Louis Grady, and Walter Shoaf continue to reside on or operate in Los Angeles' Skid Row and are frequently forced to leave some of

their property behind, packed neatly and clearly not abandoned, when attending to their daily needs. LACW's mission is frustrated by these practices, and they continue to divert resources as a result of these practices. The practices detailed in the preceding paragraphs will continue to violate their constitutional rights.

## SECOND CAUSE OF ACTION
### Right to Due Process of Law
### 42 U.S. C. §1983, Fifth and Fourteenth Amendments; Art. I,
### §7 Calif. Constitution
### Against All Defendants

99.   Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91 as though fully set forth herein.

100.   Defendants owed plaintiffs a duty under the due process clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, sec. 7 of the California Constitution, to protect the personal property of plaintiffs that was known not to be abandoned.

101.   Defendants provided plaintiffs with no notice that their property was at risk of being seized and/or destroyed. Even when defendants were specifically put on notice that the property was not abandoned and given an opportunity to stop the seizure of plaintiffs' personal items, defendants proceeded with the seizure, denying plaintiffs any due process.

102.   Plaintiffs are informed and believe that defendants' employees and agents are seizing property intentionally without a lawful justification or authority to do so, or at least defendants were deliberately indifferent to the likely consequence that the property would be seized without lawful justification or authority to do so, based on the past circumstances of similar constitutional and statutory violations of the law, and in light of an existing injunction against such actions.

103.   Insofar as defendants rely on Los Angeles Municipal Code section 56.11[4] to justify the seizure of plaintiffs' property, defendant LADID and CCEA are without any authority to enforce such an ordinance.  To the extent the ordinance is enforced by the CITY or by defendants LADID or CCEA pursuant to a valid grant of authority, the ordinance is unconstitutional and violates the Fourteenth Amendment by failing to require the CITY and its agents to provide notice of the seizure of property that is unattended but not abandoned or otherwise creating a health and safety hazard.

104.   As a direct and proximate consequence of the acts of defendants' agents and employees, plaintiffs Harry James Jones, Lloyd Hinkle, Walter Shoaf, and Louis Grady have suffered and continue to suffer injury and loss.  These plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fifth and Fourteenth Amendment rights.

105.   Plaintiffs are also entitled to injunctive relief prohibiting defendants from seizing their property in the future without due process. Plaintiffs are informed and believe that unless restrained from doing so, defendants will continue to engage in said wrongful conduct for which plaintiffs have no adequate remedy at law.  Members of LA CAN, and individual plaintiffs Lloyd Hinkle, Louis Grady, and Walter Shoaf continue to reside on or operate in Los Angeles's

---

[4] Los Angeles Municipal Code § 56.11 states

> No person shall leave or permit to remain any merchandise, baggage or any article of personal property upon any parkway or sidewalk. Provided, that boxes, barrels and other receptacles for merchandise may be unpacked and their contents removed upon parkways or sidewalks outside of the Central Traffic District if such boxes, barrels and other receptacles for merchandise are removed immediately thereafter.

Skid Row and are frequently forced to leave some of their property behind, packed neatly and clearly not abandoned, when attending to their daily needs. LACW's mission is still frustrated by these policies and practices, and they continue to divert resources as a result of these policies and practices. The practices detailed in the preceding paragraphs will continue to violate their constitutional rights.

## THIRD CAUSE OF ACTION

### Violation of Civil Rights: Interference By Threat, Intimidation or Coercion
### California Civil Code § 52.1

106.   Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91as though fully set forth herein.

107.   Defendants' agents and employees have used threats of arrest and intimidation to interfere with plaintiffs' rights secured by the Constitution of the United States, the Constitution of the State of California, and the statutory laws of the State of California.

108.   Plaintiffs are entitled to an injunction pursuant to California Civil Code § 52.1. Plaintiffs are informed and believe that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law. Plaintiffs are also entitled to damages pursuant to Civil Code §§ 52 and 52.1.

## FOURTH CAUSE OF ACTION

### Conversion

109.   Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91as though fully set forth herein.

110.   Plaintiffs owned and had a right to the possession of their personal property at the time that defendants' agents and employees seized their property without notice. Plaintiffs' property was not abandoned at the time that defendants seized it.

111.   Defendant's agents and employees intentionally and substantially interfered with Plaintiffs' property rights by unlawfully taking possession of their property and preventing plaintiffs from securing their personal property and the personal property of others left in their care. Even when able to reclaim their property, plaintiffs found that some of it was broken or missing.

112.   Defendants had no legitimate interest, governmental or otherwise, justifying confiscation of plaintiffs' property without prior notice to plaintiffs.

113.   As a direct and proximate consequence of the acts of defendant's agents and employees, plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

## FIFTH CAUSE OF ACTION
### Trespass to Personal Property

114.   Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91 as though fully set forth herein.

115.   Defendants had no legal right or justification to remove plaintiffs' property from where it was found and to store it in their warehouse.  Upon finding plaintiffs' property on the public sidewalk, and without notice to plaintiffs, defendants took and carried away all of plaintiffs' personal effects. Defendants stored the property in a place where it was difficult for plaintiffs to obtain it,  in a facility where plaintiffs could only obtain it between certain hours of the day.

116.   This taking and carrying away of plaintiffs' property restricted plaintiffs' use of said property while it was in storage and outside of plaintiffs' control.  As a direct and proximate consequence of defendants' acts, plaintiffs suffered injury: namely, the deprivation of their property for a period of time and the expenditure of time and energy to retrieve the property.

117.   Plaintiffs are entitled to compensatory damages for the impairment of the right to use their property, including but not limited to any and all injuries and

distress they suffered as a result of not having their property and for any damage to their property while in storage.

**WHEREFORE**, plaintiffs pray as follows:

1. For an injunction, enjoining and restraining defendants from engaging in the policies, practices and conduct complained of herein;

2. For a declaratory judgment that defendant's policies, practices and conduct as alleged herein violates plaintiffs' rights under the United States Constitution, the California Constitution and the laws of California;

3. For plaintiffs Harry James Jones, Lloyd Hinkle, Louis Grady, and Walter Shoaf , damages in an amount to be determined according to proof but in no event less than $4,000 per incident pursuant to Cal. Civ. Code §§ 52, 52.1 and Cal. Government Code § 815.6.

5. For costs of suit and attorney fees as provided by law;

6. For such other relief as the Court deems just and proper.


Dated: September 19, 2014                Respectfully submitted,

                                         Legal Aid Foundation of Los Angeles
                                         Schonbrun DeSimone Seplow
                                         Harris and Hoffman


                                         By:_____/s/_____
                                                 Fernando Gaytan
                                                 Attorneys for Plaintiff